LARIO, J.T.C.
This is a local property tax appeal wherein plaintiff seeks direct review pursuant to N.J.S.A. 54:3-21 of 1984 assessments on its real property located at North Laurel Street and Penn Street, in Bridgeton, designated on the tax map as Block 77, Lots 3, 4, 5, 6 and 7; Block 9, Lot 9; Block 67, Lot 14; Block 75, Lot 6; and, Block 76, Lot 14.
At the inception of the trial the taxpayer withdrew the appeals for Block 9, Lot 9; Block 67, Lot 14; Block 75, Lot 6; Block 76, Lot 14; and defendant withdrew its counterclaim seeking an increase in the assessments. The remaining lots under appeal were assessed for the tax year 1984 as follows:
*498 Block Lot Land Improvements Total
77 3 $ 1,600 $ 1,600
77 4 $244,300 $7,724,700 $7,969,000
77 5 $ 4,500 $ 4,500
77 6 $ 5,800 $ 5,800
77 7 $ 19,100 $ 19,100
$275,300 $7,724,700 $8,000,000
The subject property is a large, operating, integrated glass-manufacturing plant with facilities for glass production, plastishield operations, corrugated box operations and warehousing that is located on approximately 61.12 acres. It fronts on North Laurel Street which is located in an older, predominately residential neighborhood in the center of Bridgeton. All utilities are available to the site and the Conrail main line bisects the property. Bridgeton is in Cumberland County and is located approximately 50 miles from any major four-lane highway; however, State Highway 49, a two-lane road, is nearby.
Bridgeton is located within close proximity to a large source of sand which is the major raw material used in the production of glass. Sand represents 48% of the finished product; however, it is also the least expensive component thereof.
Plaintiff claims that approximately 17.2 acres of the land adjacent to the Cohansay River are located in the area designated “Flood Zone A” under the maps promulgated by the United States Department of Housing and Urban Development. Defendant contends that the area located within the flood plain is 15 acres. The portion of the property located in “Flood Zone A” is zoned “FP-Flood-Plain” under which the major permitted uses are the cultivation of crops and certain recreational uses. This portion of the property is marshy, has limited utility and contains no building improvements. The balance of the property is zoned “I-Industry” under which the production and processing of materials are permitted.
The plant was built by plaintiff in various stages between 1920 and 1974 and is one of the largest glass container manu *499 factoring plants in the country. The glass container manufacturing facility on the property contains multiple buildings many of which are interconnected. The buildings are divided basically into manufacturing areas and warehouse areas. The total above-grade building area is 1,741,122 square feet of which approximately 738,000 square feet is manufacturing area and the balance, approximately 1,003,000 square feet, is warehouse area and some office area. The total building area, including below-grade areas is 1,870,130 square feet of which 1,343,062 square feet of space is located on the first floor, 298,660 square feet on the second floor, 99,400 square feet on the third floor and the balance in below-grade space. As of the assessing date of October 1, 1983, over 43% of the building area was more than 50 years old, an additional 33% was more than 30 years old, and the balance was at least 10 years old.
The main issue involved in this appeal is the true value of the appealed property as of October 1, 1983. The appraisers for both parties utilized the cost approach in their appraisals, but both agreed that this approach does not accurately reflect the subject property’s value, confining the value derived from this approach strictly as a test of their respective conclusions. Taxpayer’s appraiser also used the income approach which produced a negative value on which he did not rely; the municipality’s expert did not utilize this method. Both experts relied primarily upon the market approach to arrive at their respective final conclusion of value; however, they differed as to the property’s highest and best use. Taxpayer’s expert concluded that the subject property’s highest and best use is a multi-tenant complex whereby he valued the property at $2,960,000. The taxing district’s appraiser, based upon his opinion of the property’s highest and best use as a glass manufacturing plant, valued the property at $7,400,000.
Both appraisers agree that Bridgeton City and Cumberland County, in general, were economically depressed as of the assessing date; however, they disagree as to the measure thereof. Plaintiff claims that in 1983 the value of the subject property was substantially negatively affected by specific *500 factors relating to the glass container industry. The plant manager testified that in 1983 the glass container industry throughout the northeastern United States was in serious decline; that the demand for glass containers from the Bridgeton facility had decreased significantly due to the shift in market demand to lighter and cheaper containers and due to the plant’s distant location from its customers; and that glass container manufacturing facilities such as the subject located far from its customers is contrary to modern concepts and standards. He claimed that by reason thereof their plant in Bridgeton was highly unprofitable and was placed in the continuing process of being closed down, a number of furnaces having been shut down and a number of manufacturing lines having been terminated.
Plaintiff also claims that the property’s value is further negatively affected by the lack of land area available for expansion in that the flood-plain area could not be used for industrial purposes and that it is extremely difficult to find a user for a plant of this large size and type.
Plaintiff poses that the highest and best use of the improved property is its most probable use; that this use must be permitted under existing zoning; that there must be an economic and/or social demand for the use; and, that the property must be physically suitable or adaptable for the use; therefore, the above described conditions and deficiencies of the property are related to its highest and best use.
Based upon these criteria and taking into consideration the physical conditions and characteristics of the plant, the area’s economic conditions and the declining trends in the glass container manufacturing industry, plaintiff’s expert determined that only the warehouse portion of the property, plus certain office, maintenance and social center facilities would have continuing utility and thus contribute to value. He concluded thereby that the highest and best use of the property as of the assessing date was a multi-tenant or multi-user warehouse and distribution complex, and not for use as a glass container *501 manufacturing facility. In addition he claims that the plant’s value for this projected use is also negatively affected by its general physical conditions and characteristics. Plaintiff alleges that portions of the plant are obsolete and nonuseable, claiming that: the glass melting furnaces, bath house and related manufacturing operations would have to be removed at a substantial cost to use the plant for an alternative use; the warehouse portion of the building lacked sprinklers; portions of the roof leaked badly; there were no doors on certain of the loading docks in the warehouse buildings, and such buildings are multi-level which is detrimental and the multi-level portions of the warehouse space are connected by narrow ramps resulting in their being inefficient and difficult to use; the lay-out of the buildings is congested, thereby creating difficult and inadequate access to most of the buildings. In general plaintiff claims neither the manufacturing nor warehouse portions of the plant are in keeping with modern standards of construction. To remedy these problems and to make the plant available for multi-tenant use would involve tremendous costs. An architect testified that the cost of modernizing only the warehouse portions of the plant to minimum standards in compliance with building codes would be in excess of $5,000,000. Plaintiff’s appraisal expert claimed that even after such corrections the property’s value would still be negatively affected by the poor economic conditions in Bridgeton City and Cumberland County in general.
 An appraiser must value property according to its highest and best use. Inmar Associates, Inc. v. Edison Tp., 2 N.J. Tax 59, 64 (Tax Ct.1980). The initial determination to be made herein is: what is the highest and best use of the subject property? “Highest and best use” is defined as “the reasonable and probable use that supports the highest present value, as defined, as of the date of the appraisal” American Institute of Real Estate Appraisers, The Appraisal of Real Estate, (8 ed 1983) at 244 (cited in Linwood Properties, Inc. v. Fort Lee Boro., 7 N.J.Tax 320, 329 (Tax Ct.1985)). The general rule in real property taxation is that property must be valued “in the *502 actual condition in which the owner holds it.” Newark v. West Milford, 9 N.J. 295, 304, 88 A.2d 211 (1952); Colwell v. Abbott, 42 N.J.L. 111, 115 (Sup.Ct.1880). However, this general concept is modified to avoid a disproportionate share of the burden of taxation falling upon the other taxpayers when “its value in that condition is affected by what can be done with the property.” Delaware, L & W R. Co. v. Hoboken, 16 N.J.Super. 543, 570, 85 A.2d 200 (App.Div.1951), rev’d on other grounds, 10 N.J. 418, 91 A.2d 739 (1952). The property should be examined for all possible uses and that use which will yield the highest return should be selected. Inmar Associates, Inc. v. Edison Tp., supra, 2 N.J. Tax at 64.
Plaintiff’s expert concluded that the subject property’s highest and best use is as a multi-user complex and not its present use. He based this conclusion mainly upon his opinion that the manufacture of glass containers at this plant is no longer economically feasible; the large size, poor location and physical disability of the improvements and that 738,150 square feet of the area devoted to the manufacturing process, which constitutes 42% of the total improvement, have no remaining utility. Defendant denies the validity of this opinion claiming that on October 1, 1983 the property was an efficient operating glass container plant with facilities for corrugated box production and plasti-shield application. Defendant’s conclusion was based mainly upon the fact that the facility was devoted to such use for many years and was so used on the assessing date.
The evidence discloses that at one time this plant manufactured a variety of glass products. Gross sales of glass containers in 1972 amounted to $8.5 million which declined to $4.1 million by 1980 and the plant’s financial operations went from a $2.9 million profit in 1972 to a loss of $6.3 million in 1983. Plaintiff claims that this loss is the result of the adverse affect of bottle-deposit legislation, growing competition from plastic beverage bottles and the cost disadvantages of operating an old obsolete plant.
*503 Although the demand for glass containers as a whole declined from 1980 to 1983, the demand for carbonated beverage bottles increased. Since 1982 this plant was producing only-specialized single-service, plasti-shield bottles for carbonated beverages. In October 1983 the plant’s total production level was essentially the same as several years prior.
In 1983 the Bridgeton plant’s total production of glass and plastic containers was 287,525,000 or 1.47% of the total glass containers produced in the United States. The gross total of carbonated beverage containers produced in the United States in 1983 was 59,788,000 of which 4,245,000, approximately 7%, were produced at the Bridgeton plant.
From the early 1970’s to 1983 plaintiff reduced the number of operating furnaces from eight to two and the number of glass container manufacturing machines from 24 to five. By the end of 1983 or early 1984 all manufacturing at the plant had stopped.
Under the facts in this case, the court finds no sound basis for qualifying the general rule and it determines that the subject property’s highest and best use was its existing use. The reality of the actual condition in which plaintiff held this property as of October 1, 1983 cannot be overlooked. Additionally, as stated in The Appraisal of Real Estate, supra:
A trend away from demolition and toward preservation of existing structures became clearly evident in the 1980’s. The effect of the trend has been to decrease significantly the number of instances in which the highest and best use of a site is the demolition of its building or buildings. Historic district zoning controls that make demolition permits difficult or impossible to obtain have resulted in the preservationist trend. In addition, the special tax incentives available to older buildings can substantially enhance their value and thus alter highest and best use in many cases, [at 248]
Nor can the court ignore the estimated cost of the alterations as compared to its alleged present value and projected future income. Plaintiff’s expert estimated the after-conversion net annual income to be $403,626 thereby assigning to the property a capitalized value of $2,494,598. Deducting therefrom the architects estimated cost of $5,000,000 to render the potentially useable space into rentable condition he concluded its estimated *504 ' net fair market value to be a minus $2,505,402. I find that economically it would not be feasible to convert the subject property’s improvements to an alternate use as proposed by plaintiff’s expert.
As previously noted both experts relied upon the market approach to arrive at their respective conclusions of value. Plaintiff’s expert utilized 13 comparable sales in his valuation analysis which reflected a range in selling price of building with the land area merged from a low of $1.01 a square foot to a high of $9.97 a square foot. Defendant’s expert in his analysis employed seven sales which reflected a range in selling price from a low of $2.74 to a high of $18.01 a square foot. After each expert applied his respective adjustments plaintiff’s sales reflected a range in value for building and land area merged from a low of 88$ a square foot to a high of $2.87 a square foot. From this he concluded a value of $1.70 a square foot which resulted in his finding a true value for the subject property of $2,960,000. Defendant’s adjusted comparables reflected a range in value from a low of $2.66 a square foot to a high of $4.07 a square foot. He therefore concluded a final value of $3.96 a square foot which resulted in his final true value of $7,400,000 for the subject.
By reason of this court’s above-stated determination of the subject’s highest and best use, in analyzing the expert’s respective market approaches, this court will consider and rely mainly upon those comparables introduced in evidence which are most similar to the subject property as a glass container manufacturing plant.
Of the 13 sales utilized by plaintiff, two were of glass plants; the Kerr Glass to National Can sale (Kerr Glass) and the Owens-Illinois to Hartz-Illinois Associates sale (Hartz). Of the seven sales considered by defendant, four involved glass-related plants which included the two glass sales utilized by plaintiff plus sales from Sylvania Electric Products to Chapin Industries (Sylvania-Chapin) and Kontes Glass Company to Owens-Illinois (Kontes-Owens). I find that neither of the latter two sales are *505 sufficiently comparable to warrant serious consideration. The Sylvania-Chapin sale involved a building that was not a glass manufacturing plant; instead, it was a television and radio tube manufacturing plant consisting of 700,000 square feet of a well-maintained, good-conditioned improvement, which, after the sale, was converted to multi-tenant, light manufacturing. Besides its physical superiority, it is located in Genesee County, New York State, many miles from the subject property which by reason of its distance, different tax and labor laws, shipping costs, market access, etc., raise many extraordinary problems of comparability. Compare Congoleum Corporation v. Hamilton Tp., 7 N.J.Tax 436, 447 (Tax Ct.1985) (sale should be of facilities comparable to, and not too remote from, the subject property). Tne Kontes-Owens sale involved a modern small building of but 89,662 square feet which sold at $18.01 a square foot which I find to be far superior to the subject property and any adjustment[1] required to compare it to the subject property would be purely speculative.
The Kerr Glass property sold on September 19, 1983 for a consideration of $2,118,000. At the time of the sale it was operated as a large glass bottle manufacturing plant which use was continued after the sale. It is located approximately 11 to 15 miles south of the subject in Millville which is also in Cumberland County and the sale occurred only 12 days prior to the critical valuation date. Both Kerr and the subject are extremely large plants on large acreage located near rivers and both have portions of their lands located in flood zones.
Plaintiff’s expert listed Kerr’s land size at 123.6 acres with a total building area of 1,107,059 square feet whereby he arrived at a sale price of $1.91 a square foot of building with the land area merged. Defendant’s expert, based on a land survey, measured the land at 140.14 acres and utilized a building area *506 of 773,493 square feet to conclude a sale price of $2.74 a square foot.
Defendant’s expert acknowledged that the actual total building area for the Kerr property was at least as large as stated by plaintiff, however, he claimed that the consideration represents allocation of a $58,000,000 acquisition cost of four plants including equipment purchased by National Can and, at the time of purchase, National Can was of the opinion that the Kerr property consisted of only 773,493 square feet and thus National allocated $2.74 a square foot to this property. Accordingly, it is his contention that either $2.74 a square foot should be utilized as the sale price or the sale should be disqualified as a comparable even though he admits that in all other respects it is extremely comparable to the subject. I find that defendant-expert’s contention is not acceptable. This court is aware of our Supreme Court’s admonition in Glen Wall Assoc. v. Wall Tp., 99 N.J 265, 491 A.2d 1247 (1985) wherein it stated:
We recognize that there may be instances when the sale price may not reflect true value. In such instances it is for the court to appraise the circumstances surrounding a sale to determine if there were special factors which affected the sale price without affecting the true value. L. Bamberger & Co. v. Division of Tax Appeals, 1 N.J. 151 [62 A.2d 389] (1948); Rek Investment Co. v. Newark, 80 N.J.Super. 552 [194 A.2d 368] (App.Div.1963); Almax Builders, Inc. v. Perth Amboy, 1 N.J.Tax 31 (Tax Ct.1980). Thus, a township is free to rebut evidence of a sale price with evidence that the sale was, for example, not made at arm’s length, was a distress sale, or was a sham. No such evidence was presented here, [at 282, 491 A.2d 1247]
Nevertheless, I find that the taxing district has failed to submit sufficient competent evidence to either disqualify the use of this sale as a comparable in the market data approach to value or to utilize within that approach a square-foot size other than the property’s true square footage. Defendant has failed to establish that the Kerr Glass property was purchased on a square-foot basis. The recorded deed states a flat consideration of $2,118,000; nowhere in the deed is mention made of the square footage of the improvements. Plaintiff’s expert testified that he confirmed the deed price with the purchaser’s attorney who negotiated the transaction and corroborated its *507 correctness, a procedure not followed by defendant’s expert. Moreover, the testimony of plaintiff’s expert was not rebutted.
Defendant’s appraisal report for this appeal was prepared shortly before January 21, 1985 and the Kerr Glass sale was included therein as a comparable. In the process of preparing this report he discussed the Kerr property with the Millville assessor who would not permit the expert to look at the property record card. The assessor calculated the building area and advised the expert it was 773,493 square feet. Subsequently this expert was retained on behalf of National Can, purchaser of the Kerr property, to complete an appraisal of the Kerr property for a tax appeal National Can had filed. In the process of the National Can appraisal the expert measured the improvements and found that the building area at the time of his measurement was 1,240,000 square feet, and the land area totaled 140 acres of which 53 acres were in the flood zone. To prepare the appraisal for the National Can tax appeal this expert testified he was originally contacted by the attorney handling the tax appeal for National Can and it was that attorney who supplied him with the incorrect 775,000 square-foot figure. He did not speak with any of the buyer’s principals involved in this purchase concerning the alleged allocation. He did not testify to the existence of any written or oral agreement entered into between the parties setting a square-foot purchase price or allocation, nor did he speak with anyone connected with the seller concerning this issue. I find that this expert’s statement of a square-foot sale basis is not supported by any facts and is purely an assumption on his part. I cannot accept an allegation that the seller and purchaser, their respective real estate departments, and the real estate brokers involved in this sale believed that this admittedly extraordinarily large complex contained only 773,493 square feet. Any experienced real estate person, by merely viewing this property, would recognize that these improvements measured far in excess of 773,493 square feet. And I cannot imagine a square-foot purchase price allocation for a sale of this magnitude being *508 made without some attempt by the parties to secure correct measurements.
I find that the Kerr sale is a usable comparable sale and that the building area to utilize in an adjustment to the subject is the correct square footage as of the date of the sale. Accordingly, I accept the Kerr Glass improvement measurement of 1,107,059 square feet as used by plaintiff’s expert which reflects a sale price of building with land area merged of $1.91 a square foot. The sole adjustment to this sale made by plaintiff’s expert was a — 27% for land value. Applying this percentage to his original sales price results in his adjusted merged-unit sale price of $1.39 a square foot to be applied to the subject property.
In analyzing this sale defendant’s expert, contrary to plaintiff’s expert, made the following adjustments: size — 11%; age/condition + 08%; land to building ratio — 19%; utility + 50%; and, location + 16% for a composite of + 44%. Based thereon defendant’s expert arrived at an indicated rate of $3.95 a square foot. Since he utilized the incorrect building area for this sale it is obvious that his size adjustment is erroneous, therefore, I accept plaintiff’s conclusion of no adjustment for size.
Plaintiff’s expert arrived at his — 27% land adjustment as follows: He ascribed a total land value of $741,600 to the Kerr land and $281,000 to the subject’s land. He then divided each of the land values by its respective total improvement square footage to arrive at a value for land with the building merged of 67$ a square foot for the Kerr sale and 16$ for the subject. He then divided the difference 51$ by the square foot unit price of the sale, $1.91, to conclude a total land adjustment of — .267 which he rounded to — 27% attributable to the Kerr sale.
*509 I find plaintiff-expert’s formula for land value adjustment to be an acceptable method usable in a market approach[2]; however, I do not accept as correct his price allocations for the respective land values. I find that the Kerr property consists of 140.14 acres (based on the land survey testified to by defendant’s expert) with 53 acres located in the flood plain. Plaintiff’s expert valued this total land at $6,000 an acre ascribing no discount to the flood-plain acreage. One of the basic reasons given by plaintiff’s expert for valuing the subject’s flood plain land at $1,000 an acre and not discounting Kerr’s flood-plain land was the alleged difference in topography, claiming that National Can could expand its improvements and build upon the flood-plain but that the subject property could not be expanded upon without great risk and expense. However, in his earlier testimony, this expert claimed that by reason of the subject’s large size and type it is difficult to find a potential user, concluding that its present size is too large. Additionally, the recent trend in the construction of large industrial plants is to situate them so that the improvements are surrounded by expansive acreage which not only adds to the plant’s attractiveness but primarily acts as a buffer to neighboring areas. As observed by Judge Andrew in Inmar Associates, supra:
It is well known that zoning may substantially increase or decrease the value of property because of the allowance or limitation of uses within a particular zone. The Appraisal of Real Estate, supra at 119. Within zoning concepts there has been a trend during the last 50 years to reduce the percentage of a lot that a structure will be permitted to occupy with a concomitant affect on land value. Ibid. [2 N.J.Tax at 65]
Both experts agree that these two plants are extremely large and from their respective testimony I conclude that it is highly impractical and improbable that either the present owner or a prospective purchaser would enlarge either of these plants. I find that plaintiff’s formula allocation of $1,000 to the floodplain land of the one property and $6,000 to similar land in the other property is unsupported and arbitrary; therefore, in his *510 formula the same $1,000 value as was applied to the flood land of the subject property should be applied to the Kerr flood property. Since the 140.14 acre Kerr property contains 53 acres of flood-plain, the land value adjustment is to be amended as follows:
Total Kerr land — $575,840 ($53,000 + $522,840) divided by its total improvement area of 1,107,059 square feet equals 52c a square foot. Deducting therefrom the subject’s land value of 16c a square foot as calculated by plaintiff ($281,000 h- 1,741,-222) equals 36c which, divided by the sale price of $1.91 indicates a land adjustment of —.188 rounded to —19%. If the subject’s total above and below-grade square footage of 1,870,-130 is used a land adjustment of —.1937 is indicated. I find that a rounded land adjustment of —19% should be used.
Plaintiff’s expert did not apply an age/condition, functional utility and quality of construction adjustment to this sale (although he did in 11 of the 12 other sales he considered) concluding that it was unnecessary because the improvements were equal; whereas, defendant’s expert did adjust for those items. Plaintiff’s glass plant is primarily a single complex with the major manufacturing process under one roof. The Kerr Glass facility is divided into 54 buildings, five noncontiguous parcels with many satellite buildings that are used in the production process. In the Kerr plant, after the product is manufactured, to move it to the warehouse requires crossing two heavily traveled streets. Since the major manufacturing process within the subject is contained within one site, the product remains under one site from its raw material stage to a finished result. I find that defendant’s expert having made a detailed appraisal of the Kerr property for its present owner is more familiar with the comparability of the two buildings than is plaintiff’s expert, I believe his contention that the improvements are not equal and I am persuaded that all of the other adjustments made by defendant’s expert are acceptable; therefore, those adjustments, which total + 74% are approved. Applying the resulting composite of + 55% (+ 74% — 19%) to the $1.91 sale price ($1.91 X 55%) results in a differential of + 1.05 *511 which produces an adjusted comparable sale rate of $2.96 a square foot.
The other sale considered as a significant comparable is the Hartz sale which also involved a glass manufacturing facility. Included in the Hartz sale was land of 57.88 acres, a section of which is in the flood-plain, with building improvements of 932,466 square feet. The primary improvements consist of three buildings; a main floor office and shop area; a package supply and processing area and a glass container area. Additionally, there exist some minor buildings. The main improvements contain a partial basement area partitioned for various uses. The original building is 24 years old with additions added in 1962, 1964, 1966 and 1967. It was sold in April 1983 for a cash consideration of $9,200,000. Although its use was converted from a glass bottling plant to multi-tenant industrial, the grantor retained use of 12,000 square feet for glass recycling for three years.
Both experts applied $9.87 a square foot of building with the land area merged as the sale price. Plaintiff’s expert adjusted this sale by — 75%. He applied a — 45% to land value, — 5% for improvement location; — 3% for demolition costs incurred by seller, — 3% for ratio of usable/non-usable building area and — 20% for age, etc., thereby arriving at an indicated comparable rate of $2.37 a square foot. In his direct testimony plaintiff’s expert said he erred in his adjustments for the ratio of usable to nonusable building area in comparing the improvements of this sale to the subject, stating instead it should have been a downward adjustment of — 20% instead of — 3% which would substantially reduce the indicated value of the sale to the subject from his prior $2.37 a square foot to 69$ a square foot. He stated that this error was not discovered until after he had submitted his report herein and although making a correction would result in a decrease in the value of the subject, having committed himself to a market value of $1.70 a square foot in his report he did not change his final opinion of market value for the subject. Upon cross-examination he admitted that the adjustment for ratio of usable to nonusable building area was *512 based upon his conclusion that the subject’s highest and best use was a multi-user complex, not a glass plant, and if he was in error this adjustment should not be made.
In the market data approach adjustments made to comparable sales are mainly subjective in nature. For the instant sale plaintiff has calculated adjustments of from — 76% to — 93% reducing the comparable sale price from $9.87 a square foot to either $2.37 a square foot or 69<t a square foot. Even if I were to ignore the errors this expert made in adjusting this sale, his extreme percentage of adjustment standing alone is sufficient to disqualify its use.
Defendant’s expert adjusted this sale by — 63% as follows: Size, — 9%; age/condition, — 12%; land and building ratio, — 15%; and location, — 27%. He thereby arrived at an indicated value to the subject of $3.65 a square foot. Although defendant-expert’s adjustments were not as extreme as plaintiff’s, nevertheless, a — 63% adjustment casts grave doubt upon the reliability of any conclusion reached concerning this sale. “Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties so as to admit of reasonable comparison.” Venino v. Carlstadt Boro., 1 N.J. Tax 172, 175 (Tax Ct.1980), aff’d o.b. 4 N.J. Tax 528 (Tax Ct.1981). It is acknowledged that comparable sales of large industrial properties similar to the subject are not readily available; therefore, whenever found such sales should be examined. However, even though the Hartz sale, being a large glass plant, should not be completely ignored, it is apparent that its consideration as a comparable is not to be given much weight.
I find that the generally depressed condition of the glass industry and the adverse economic state of the Bridgeton area are already largely reflected in the market prices of the Kerr Glass sale and to some extent in the more modern and better located Hartz sale. These two sales as compared to sale prices of industrial buildings generally are unquestionably low, therefore, no further adjustments for these negative factors should *513 be made. I find that the Kerr Glass sale is the most significant comparable sale placed in evidence and it is to be given the greatest weight in determining the subject’s market value. Kerr Glass indicates a market value of $2.96 a square foot. Adding some slight consideration for the Hartz sale, which suggests a higher market value, I conclude that the subject property is to be valued at a rounded figure of $3 a square foot. It is noted that both experts concluded a final value in excess of the adjusted Kerr sale value. When applied to the 1,870,130 square foot improvements $3 a square foot results in a total true value of $5,610,390 rounded to $5,610,500.
The above true value determination represents the property’s total value as a single economic unit without allocation to the individual lots under appeal. The taxing district has assessed the subject as separate line items and, in this matter allocation being an administrative function, defendant is directed to submit within 20 days, with notice to plaintiff, its proposed allocation of assessments based upon the total true value of $5,610,-500, to be applied to the individual lots under appeal. Upon receipt thereof final judgment will be entered.

 Defendant used an adjustment of — 80% to arrive at an adjusted value of $3.60.

 It frequently has been stated that there is no singular doctrinaire approach to value. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 62, 65, 208 A.2d 153 (App.Div.l965); Genola Ventures v. Shrewsbury, 2 N.J.Tax 541, 551 (Tax Ct.1981).