RIMM, J.T.C.
These consolidated local property tax matters involve valuation and discrimination for the tax years 1984 and 1985. The taxpayer contests the assessments for these years on its property on Center Street, Freehold Township, designated as Block 43, Lot 35 on the township’s tax map. The assessment for each year was:
Land $ 702,500
Improvements 10,297,500
Total $11,000,000
The subject property consists of a tract of land improved with a glass container manufacturing plant. It is approximately one-half mile from Route 33 which provides access to the New Jersey Turnpike, approximately 12 miles distant, and to U.S. Route 9, approximately two miles distant. The property is in close proximity to an abundant supply of sand, a major raw material used at the plant, and is well located within the plant’s distribution area of Philadelphia, Eastern Pennsylvania and the New York-New Jersey metropolitan area. The improvements consist of a heavy steel frame manufacturing and warehouse facility constructed in stages from 1956 to 1976.
Stipulations entered into between the parties are as follows: 1. the total land area is 46.83 acres, with a value of $12,000 an acre or a total value of $562,000, rounded, for both tax years;
*359 2. the improvements consist of a total of 926,000 square feet;
3. the reproduction cost new of the improvements as of October 1,1983 for the tax year 1984 was $19,800,000 and as of October 1, 1984 for the tax year 1985 was $19,850,000, both amounts not including any costs for the glass manufacturing furnaces located in the plant, and
4. depreciation, designated as “normal age-life,” or physical, was 30% for each tax year.
It was also agreed, however, that these stipulations would not preclude proof from taxpayer of additional depreciation nor would they preclude proof of value by the sales comparison or income approaches to value.
Taxpayer’s appraiser used the cost and sales comparison approaches to value, relying primarily on the sales comparison approach for his opinion that the subject property had a fair market value of $7,800,000 for each tax year. The municipality relied only on the cost approach, and its appraiser concluded that the property had a value of $14,422,000 for the tax year 1984 and a value of $14,457,000 for the tax year 1985, exclusive of the value of the furnaces.
The original construction in 1955 consisted of a manufacturing area and a contiguous warehouse. In 1956, additional warehouse space was added adjoining the original warehouse. In 1967, the warehouse area was substantially enlarged by construction adjoining the 1956 warehouse. In 1969, additional manufacturing area was added contiguous to the original warehousing constructed in 1955 and 1956. Finally, the warehouse area was again substantially increased in 1976 by construction adjoining the 1969 addition.
The manufacturing area is one- and two-stories high with a basement area. It contains 238,431 square feet. The foundation consists of concrete walls and footings. The area has a steel column frame with reinforced concrete, corrugated metal and steel sash exterior walls. The roof structure is steel trusses and beams with continuous roof vents, and the roof cover is corrugated metal. The floors are reinforced concrete *360 and brick with a concrete sealer covering. There are minimal masonry partitions and minimal heating, the manufacturing process itself supplying heat. Construction is such throughout the structure that heat is vented from the manufacturing process. This area also contains 2,300-volt KVA and 440-volt KVA rigid conduit wiring and high-pressure sodium and florescent lighting. There is a dry sprinkler system throughout. The west end of the area houses two 2800° glass manufacturing furnaces. The remaining area is utilized for processing, packaging, carton assembly, a mold room and a machine room.
Next to the manufacturing area is a “batch house” connected by a bridge. This structure is used to store the raw materials used in the production of glass and is similar in design to a grain elevator. It is a masonry structure with a total of 15,750 square feet on six floors. Its foundation, frame, roof structure and floors are reinforced concrete. Its exterior walls are reinforced concrete, corrugated metal and welded steel. It has a dry sprinkler system and an Otis elevator with a 2,000 pound capacity and six stops. The bridge is an elevated concrete and steel structure with a steel frame, corrugated metal exterior walls, a corrugated metal roof cover and a reinforced concrete floor containing 700 square feet.
The warehouse area is one story and contains the office area which is contiguous to the manufacturing section. The total area is 674,228 square feet, including 7,360 square feet of office space. The foundations are concrete; the frame is steel columns; the exterior walls are corrugated aluminum; the roof structure is steel trusses and beams; the roof cover is corrugated aluminum with skylights, and the floor structure and covering are reinforced concrete and concrete sealer. There are masonry and dry wall partitions. There are a dry sprinkler system, mercury vapor lighting and gas-fired and electric warm air ceiling-mounted units and steam heat from a gas/oil-fired boiler. The office and a cafeteria area have air conditioning. There are also various yard buildings with a total of 7,457 *361 square feet.[1]
The improvements also consist of 40 truck docks, 2,400 feet of rail siding, approximately 150,260 square feet of asphalt paving, approximately 18,620 square feet of concrete paving, 800 linear feet of six-foot high fencing with a gate, 24 poles with mercury vapor lighting, 12 storage tanks varying from 2,350 gallons capacity to 397,846 gallons capacity and a water tower with a capacity of 282,027 gallons.
In his appraisal marked in evidence, taxpayer’s expert defined highest and best use and then stated that,
highest and best use, as it applies to the subject, is as it relates to the existing industrial improvements. This use is permitted and the subject's location in the heavily industrialized area, coupled with the vastness of the improvements, precludes any alternative highest and best use consideration.
However, notwithstanding this opinion that the existing use is the highest and best use of the subject property, the expert also stated in his appraisal that “[fjurther consideration must be given to the industrial use of the improvements regarding either value in use or value in exchange.” From such consideration, the witness concluded that the only way to value the subject property is to value it in exchange based on a market for general-purpose industrial properties with multi-tenant occupancy. His testimony was to this effect also. Plaintiff’s appraiser therefore analyzed sales of seven properties said to be comparable to the subject.
The first comparable sale used by plaintiff’s appraiser was that of an industrial building of 1,020,830 square feet which sold in April 1983 for $10,350,000 cash or $10.14 a square foot of building area for land and improvements merged. Cardboard containers were manufactured in the comparable property. In terms of physical depreciation, according to the testimony of the witness, the property was “similar to the subject property.” The subject, however, would offer “a greater utility” because it has higher ceilings.
*362 The witness then testified that he adjusted the unit price of the comparable of $10.14 by a total negative adjustment of 15% and concluded that the adjusted unit price for the subject was $8.62 a square foot. He testified that he adjusted for factors which most affected value. They were time of sale, location, size, land-to-building ratio, percentage of office space, age, quality of construction and condition. There was no other testimony on the adjustments with regard to comparable sale number one. There was, however, a page in the appraisal which contained the following:
Comparable Sale No. 1 (Continued)
Adjustments The following adjustments are necessary when comparing the comparable to the subject:
Comparable_Subject_Adjustment
Date of Sale 4/83 10/83 +5%
Location Holmdel Freehold 0
Size 1,020,830 SF 920,116 SF 0
Land-to-Building Ratio 6.01:1 3.79:1 -15%
Percentage Office Space 3% 1% 0
Age 1962 1967 (Effective Age) + 10%
Quality of Construction Average Low-Average -15%
Condition Good Good 0
Total Adjustments -15%
The second comparable sale involved a property sold in December 1982 for $8,090,635 cash. The land area is 125 acres and the building area is 812,097 square feet. The building is a one-story steel and insulated metal panel warehouse built in 1972 and is located in Cranbury, Middlesex County, New Jersey. In connection with the sale, the grantor leased back approximately 251,000 square feet of warehouse space at $2.35 a square foot net for a five-year term. It was the appraiser’s opinion that $2.35 a square foot was market rent, but this opinion was not otherwise supported. The witness also testified that use and size influenced his thinking as to the comparability of this sale. With regard to adjustments, the witness *363 testified that he made a total adjustment of minus 25%. There was no other testimony on the adjustments, but his appraisal indicates adjustments of plus 10% for time, minus 10% fair location, minus 15% for land-to-building ratio, and minus 10% for age.
Comparable sale number three involved a property in South Brunswick, New Jersey, with a building area of 636,000 square feet which sold on July 9, 1984. According to the witness’ testimony, this comparable sale property “offers the same characteristics” as the subject property. The total adjustments between this comparable and the subject was a negative 5%. The comparable sale property was considered better than the subject property because of its location and because it was smaller in size than the subject property. There was no further oral evidence concerning adjustments, but the appraisal indicates adjustments of negative 5% for time, negative 15% for land-to-building ratio, negative 5% for percentage of office space and positive 10% for age. There was no adjustment for location or size notwithstanding the witness’ testimony.
Comparable sale number four involved a property in Linden, New Jersey, which sold on June 19, 1985 for $5,500,000. The comparable was, according to the witness, usable because of similar utility relative to size, although the comparable’s improvements had less than one-half the total number of square feet of the subject’s improvements. The witness did, however, testify that this was not one of the better comparables because of size. The witness testified that he made total adjustments of minus 35%. No further testimony was presented on the adjustments. The appraisal indicates adjustments of minus 10% for time, minus 10% for location, minus 5% for size, minus 5% for land-to-building ratio, plus 10% for age and minus 15% for quality of construction.
Comparable sale number five was located in Philadelphia, Pennsylvania, and involved a property with a building of 777,-736 square feet which sold in July 1984 for $6,500,000 cash. The comparable property offered similar utility when compared *364 to the subject property. The witness also testified that he made a total adjustment of plus 8%. There was no further testimony on the adjustments. The appraisal indicates adjustments of minus 5% for time, minus 5% for location, minus 10% for percentage of office space, plus 38% for age, minus 15% for quality of construction and plus 5% for condition.
The sixth comparable sale involved the sale of the Owens-Illinois, Inc. plant in North Bergen, New Jersey, in April 1983 for $9,200,000. The improvements had a total area of 932,466 square feet. The witness testified that the property was “a good value indicator” although it was not sold as a glass manufacturing plant.[2] With regard to adjustments, the witness testified that the biggest adjustment was for location in the amount of minus 10% which, according to the witness, was offset by a plus 10% adjustment for age. There was, however, a minus 15% adjustment for quality of construction, the witness testifying that the quality of construction of the comparable property was better than that of the subject property. The result was an adjustment of minus 15%.
The last comparable which plaintiffs expert used was the sale of property in Washington County, Pennsylvania, on November 30, 1984 for $1,200,000. The area of the improvements was 565,863 square feet. The grantor is plaintiff in the matter presently before the court. The property had a use similar to that of the subject, but it was the least reliable comparable because of its age and condition. The appraisal indicates adjustments of minus 5% for time, plus 50% for age, and plus 40% for condition. The witness testified that, because he made adjustments of plus 85%, he did not consider the property a comparable property for purposes of valuation. Indeed, the need for adjustments of such magnitude renders worthless any alleged comparable property. Owens-Illinois Glass Co. v. Bridgeton, 8 N.J.Tax 495, 512 (Tax Ct.1986) (An extreme per *365 centage of adjustment, in that case an adjustment of minus 76%, standing alone is sufficient to disqualify a comparable sale.)
From these sales, the witness concluded that the subject property had a value of $7,800,000 for each of the two years involved.
By the cost approach plaintiffs expert valued the property at $7,492,000 for 1984 and $7,504,500 for 1985. His opinion of value by the cost approach was based on the stipulations between the parties and a determination by him that the cost of reproduction new had to be further reduced by 35% for “special functional obsolescence,” a form of depreciation.
Depreciation accrued from all causes was abstracted from the market by the appraiser. Using the comparable sales from his sales comparison approach, the witness determined the cost of the improvements for each property, subtracted the market value of the improvements from the cost, after allowing for land value and allocated the difference to all forms of depreciation. He then calculated physical depreciation for each property, subtracted it from the total depreciation determined for each property by the abstraction method, and attributed the difference to what he called “special functional obsolescence.” From these calculations he concluded that the subject suffered from functional obsolescence of 35%. For example, his accrued depreciation analysis for comparable sale number one, typical of his analysis for each comparable property was as follows:
Comparable Sale No. 1 (Continued)
Accrued Depreciation Analysis
Estimated Replacement Cost — New at the Date of Sale 1,020,830 Square Feet @ $26.50 per Square Foot $27,051,995
Less: Sale Price of Improvements
Total Sale Price $10,350,000
Less: Land Value
(140.855 Acres @ $20,000 per acre) 2,817,100
Depreciated Value of Improvements 7,532,900
Measure of Accrued Depreciation (All Causes) $19,519,095
(72.2% of Replacement Cost — New)
*366 Less: Normal Accrued Depreciation Based on an Effective Age of 21 Years 47% (21-45)
Estimated Replacement Cost — New $27,051,995
Normal Accrued Depreciation Rate _.47
Amount of Normal Depreciation $12,714,438
Allocation of Accrued Depreciation to Special Functional Obsolence (25.2% of Replacement Cost — New) $ 6,804,657
Accordingly, plaintiffs expert’s opinion of value by the cost approach for each of the tax years may be summarized as follows:
For the tax year 1984
Cost of reproduction new, $19,800,000 Depreciation:
"Normal”, of 30%, stipulated: 5,940,000
Functioned obsolescence, 35% 6,930,000
Total depreciation $12,870,000
Total value of improvements 6,930,000
Value of land 562,000
Total value of property for 1984 $7,492,000
For the tax year 1985
Cost of reproduction new, $19,850,000 Depreciation:
"Normal”, of 30%, stipulated 5,955,000
Functional obsolescence, 35% 6,947,500
Total depreciation $12,902,500
Total value of improvements 6,942,500
Value of land 562,000
Total value of property for 1985 $7,504,500
Defendant’s appraiser used only the cost approach in valuing the subject property. He found the cost approach to be the best method of valuing the property, due to its particular features. He also testified that the improvements do not suffer from functional nor economic obsolescence. His opinion that the subject property does not suffer from economic obsolescence is uncontradicted in the record.
*367 The parties stipulated the cost of reproduction new of the improvements and the percentage of the cost of reproduction new attributable to physical depreciation. However, in the cost approach, depreciation from all causes is subtracted from the cost of reproduction new as representing a loss in property value. Physical depreciation is the “wear and tear” or deterioration to which the building has been subjected.
Other types of depreciation are caused by obsolescence, which may be either functional or external. Functional obsolescence may be caused by the inadequacy or super adequacy of a building size, style or mechanical equipment. Physical deterioration and functional obsolescence can usually be observed in the improvement. External obsolescence is caused by factors outside the property such as changes in demand, general property uses in the area, zoning, financing and government regulations. [American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987), at 378]
Functional obsolescence consists of those deficiencies within the property such as materials, layout or design. Functional obsolescence is measured by excess construction costs and/or excess operating expenses. Defendant’s position is that the subject property does not suffer from any functional obsolescence. Defendant’s valuation expert testified that he did not find any evidence of functional deficiencies or super adequacies in the property. His opinion was essentially based on his inspection of the Brockway plant in Danville, Virginia, which was constructed in 1979.[3] That construction date, for purposes of using the property as an indication of the existence of functional obsolescence in the subject property, was, in the opinion of the witness, “relatively recently in terms of our valuation dates.” The inspection indicated to the witness that the “facility was such that it was almost identical, almost a clone of the facility in Freehold.” Such construction by Brock-way in 1979 of a facility almost identical to the subject property suggested to the witness that the Brockway facility in Freehold is operating today essentially as it had been at the time of its construction, and it would be reconstructed today essentially as *368 it had been originally constructed. Accordingly, the witness concluded that there was no functional obsolescence.
Economic obsolescence is a loss in value resulting from influences external to the property. Indicators of economic obsolescence are reduced demand for products or services caused by the adverse impact of market forces; excessive costs of raw materials or supplies; shifting asset use patterns; changes in governmental regulations and restrictions, and increased distribution and transportation costs, among others. Defendant’s valuation expert testified that, as a result of inquiries made by him of the glass industry, he found nothing whatsoever to suggest that Brockway, or a company like Brock-way using the subject facility, would be confronted with any economic obsolescence at the property. He testified that he discussed the location of the property at great length with a Brockway representative, and concluded that Brockway’s marketing and distribution methods at the plant are oriented towards Philadelphia and New York. In addition, a significant portion of the raw materials used at the facility is in reasonable proximity to the property. The witness concluded that, reviewing the raw material sources and the distribution of product, the plant is in an excellent location. Further, the witness testified that, based on his interviews with Brockway’s representatives, he learned that, as of the spring of 1985, the plant had already sold its entire 1985 production and approximately 50% of its 1986 production.[4] The plant, at the time, was operating 24 hours a day, three shifts a day, 52 weeks a year with some minor shutdowns for vacations. Indeed, defendant’s expert states in his appraisal, “[b]ased upon careful examination of the economics of the property and the market demands, the appraiser is of the opinion that the existing use is a legal and conforming use and concludes that the Highest and Best Use of the property is its present use.” Emphasis supplied.
*369 Accordingly, defendant’s expert’s opinion of value may be summarized as follows:
For the tax year 1984
Reproduction Cost New $19,800,000
Depreciation of 30% for Physical Depreciation 5,940,000
Value of Improvements $13,860,000
Value of Land 562,000
Total Value $14,422,000
For the tax year 1985
Reproduction Cost New $19,850,000
Depreciation of 30% for Physical Depreciation 5,955,000
Value of Improvements $13,895,000
Value of Land 562,000
Total Value $14,457,000
Upon considering the evidence of both parties, I conclude, first, that taxpayer’s expert’s use of the sales comparison approach and his analysis are faulty. Although he acknowledges that sale number seven does not involve a comparable property, his appraisal says that “equal consideration is given to all sales in the final analysis.” The result is to skew the unit value to the low side. In addition, the witness stated that his answers regarding all the sales would be essentially similar to those for comparable number one. With regard to comparable number one, the witness answered, when asked when he inspected the property, “I would have no idea, no.” If the witness cannot even remember when he inspected a property, I cannot give his adjustments for condition much, if any, weight. Further, “[industrial properties must have land to building ratios that allow plenty of space for parking, truck maneuvering, yard storage, and expansion.” The Appraisal of Real Estate, supra at 261. Yet there was absolutely no discussion of any of these factors and how they influenced the witness’ adjustments. The witness also testified that comparing land-to-building ratios, and adjusting for them in the sales comparison approach, could only be done effectively if there were knowledge of the land coverage requirements of the zoning ordinances applicable to the subject property and to the compara *370 ble. However, he testified that, with regard to comparable number one, he did not know these requirements in Holmdel, the location of the comparable, nor did he know these requirements in Freehold, the location of the subject. In addition to these specific deficiencies, plaintiffs expert’s evidence was essentially a series of unsupported statements of adjustments made but not explained.
The subject property simply is not comparable to at least five of the seven comparables. None of them contain manufacturing space similar to that of the subject. According to the witness, approximately 250,000 square feet of the subject property, or more than one-fourth of the improvements, cannot be converted to the general-purpose industrial use posited by him. At most, the area could be used for dead storage. In effect, plaintiff’s sales comparison approach would not value 25% of the subject property. The configuration of the remaining area also does not lend itself to effective conversion to general-purpose industrial use by tenants using approximately 150,000 square feet each, the area plaintiff’s expert said was the basis for his sales comparison approach. The location of the office space and the locations of the loading docks preclude division of the subject property for tenants in the manner in which the comparable properties can be so divided. Most significant, for comparison purposes, is that, according to the witness’ own testimony, the subject property is of a singular design, engineered by plaintiff for its specific needs, distinguishing it even from other glass manufacturing plants. One of the most unusual aspects of the design is the roof structure designed and built by Brockway with particular regard to heat generated in the manufacturing area and diffused into the warehouse area. The roof structure in the subject property is completely different from that of six of the seven comparables, precludes conversion of the subject to general-purpose industrial use in any realistic manner, and, with the other physical characteristics of the subject property, vitiates the use of the sales comparison approach in this matter. Cf U.S. Life Realty Corp. v. Jackson Tp., 9 N.J.Tax 66, 72 (Tax Ct.1987).
*371 Second, for local property tax purposes, real property is valued in accordance with N.J.S.A. 54:4-23. This statute provides, in pertinent part, that “[t]he assessor shall ... determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1____” This standard of value is imbedded in appraisal theory and practice. Value is “the most probable price, as of a specified date ..., for which property ... should sell after reasonable exposure in a competitive market” under conditions insuring a fair sale from a knowledgeable seller to a knowledgeable buyer. The Appraisal of Real Estate, supra at 19. This standard of value has been adhered to by our Supreme Court.
Certain principles governing real property taxation practice and administrative and judicial review of property tax assessments have become almost axiomatic. N.J.S.A. 54:4-23 provides for the determination of taxable value of real property. This provision requires that all real property be assessed at true value, which is defined as the value the property would bring at a fair, bona fide, and uncoerced private sale. [Pantasote Co. v. Passaic City, 100 N.J. 408, 412 (1985)]
CPC International, Inc. v. Englewood Cliffs Bor., 193 N.J.Super. 261, 473 A.2d 548 (App.Div.1984), certif. den. 97 N.J. 578, 483 A.2d 124 (1984), recognized that the buyer and seller in the definition of value are only a hypothetical buyer and seller, a buyer and seller acting in a hypothetical market under clearly defined circumstances on the basis of whose action a market value is then determined.
For taxation purposes fair market value is the price which could be obtained for the property, in money, at a fair sale between a willing seller not obliged to sell and a willing buyer not obliged to buy____ [T]he sale contemplated as a criterion of market value is a hypothetical sale; hence, the would-be buyers are hypothetical buyers, not actual and existing purchasers. [193 N.J.Super. at 267-268, 473 A.2d 548]
The Tax Court has dealt with the hypothetical nature of the sale which is the standard for determining value. “The search is for the true value of the property, specifically the price a hypothetical willing buyer would pay a hypothetical willing seller.” ITT Continental Baking Co. v. East Brunswick Tp., 1 N.J.Tax 244, 251-252 (Tax Ct.1980). “There is no one doctri *372 naire approach to the valuation of property____ The search is for the true value of the property; that price which a hypothetical buyer would pay a hypothetical willing seller.” Petrizzo v. Edgewater, 2 N.J.Tax 197, 200 (Tax Ct.1981). “Ultimately ... [the Tax Court is] seeking to find the true value of the property, specifically, the price a hypothetical willing buyer would pay a hypothetical willing seller on October i of the pretax year.” Genola Ventures v. Shrewsbury Bor., 2 N.J.Tax 541, 551 (Tax Ct.1981).
Plaintiff argues that glass plants do not sell as such. There is evidence that no glass plants, as separate, viable, existing and continuing glass plants, have been sold in the United States in the last 60 years. Accordingly, plaintiff contends, the subject property must be valued as something other than that which it is, that is to say, it is not to be valued as a glass plant but it is to be valued as a general industrial complex to be used by occupants requiring less space for their use than the total area of the subject improvements. The subject property is therefore, according to plaintiff, to be valued at other than plaintiffs own admitted determination of its highest and best use because it will not exchange in the market at its highest and best use, there being no actual buyer for a glass plant. Such a position is self-contradictory: every property, by definition, should exchange in the market at its highest and best use. Otherwise it will not be exchanged: every seller will sell his property for the use which will bring the highest price. “Highest and best use has been defined as ‘the reasonably probable and legal use of vacant or an improved property, which is physically possible, appropriately supported, financially feasible, and results in the highest value.’ ” The Appraisal of Real Estate, supra at 42. The highest and best use of the subject property is its continuing use as a glass manufacturing plant, and it has to be valued as such for local property tax purposes. Owens-Illinois Glass Co. v. Bridgeton, supra, 8 N.J.Tax at 501-502.
*373 In order to value real estate for local property tax purposes, neither party to the litigation, in advancing its opinion of value, must produce an actual buyer for the subject property. The net effect, therefore, of plaintiffs position is that the sales comparison approach to the valuation of the subject property cannot be used because of a lack of data.
Since it is beyond argument that there is no one, doctrinaire approach to the valuation of property for local property tax purposes, I must turn to the approaches other than the sales comparison approach in order to value the subject property.
The search, of course, is for the fair value of the property, the price a willing buyer will pay a willing seller. Consideration may be given to cost less depreciation and sales of comparable property. It may also be given to rental income, [citations omitted] There can be no rigid, rule. The answer depends upon the particular facts and the reaction to them of experts steeped in the history and hopes of the area. [New Brunswick v. State of N.J. Div. of Tax Appeals, 39 N.J. 537, 543-544, 189 A.2d 702 (1963); emphasis supplied]
The correct valuation approach depends on the “known data and the common sense of the situation.” Id. at 551, 189 A.2d 702.
Both parties acknowledge that the income approach cannot be used in this matter and, since the sales comparison approach cannot be used, testimony and documentary evidence of the opinions of the experts of value based on the cost approach must be carefully considered. The cost approach is, after all, an acceptable approach to be used in valuing real property for local property tax purposes if value by the other approaches cannot be sustained. Coca-Cola Bottling Co. of N.Y. v. Neptune Tp., 8 N.J.Tax 169, 176 (Tax Ct.1986); Pennwalt Corp. v. Holmdel Tp., 4 N.J.Tax 51 (Tax Ct.1982); ITT Continental Baking Co. v. East Brunswick Tp., supra.
The cost approach involves the current cost of producing or replacing the improvements, minus the loss in value from depreciation, plus land value.
The cost approach is based on the premise that the value of a property can be derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (i.e., deterioration and obsolescence) in the structures from all causes____ This approach is particularly useful in *374 valuing new or nearly new improvements and properties that are not frequently exchanged in the market. [The Appraisal of Real Estate, supra. at 71]
The cost approach is based essentially on the principle of substitution which “states that when several similar or commensurate commodities, goods or services are available, the one with the lowest price attracts the greatest demand and widest distribution.” Id. at 35.
This principle affirms that no prudent investor would pay more for a property than the cost to acquire the site and construct improvements of equal desirability and utility without undue delay. Older properties can also be substituted for the property being appraised, and their value is measured relative to the value of a new, optimal property. Consequently, the reproduction cost of a property on the date of the appraisal plus its site value provides a measure against which prices for improved properties may be judged. [Id. at 346]
In reality, except perhaps for the need to evaluate “undue delay,” the cost approach fixes the top price that a property will command in the market place. No one would pay more for an improved property than he would have to pay for the land and the cost of improvements, again allowing for “delay.” For local property tax purposes, no one should expect to have his property valued at less than the value indicated by the cost approach if there is no sales comparison data and no income approach proof available to otherwise value the property. If the evidence of value by the cost approach is reasonable, given the analysis of the expert advocating that value, then for local property tax purposes, the cost approach fixes the value of the real estate. In this regard,
[t]he weight to be given to an expert’s opinion depends especially upon the facts and reasoning which are offered as the foundation of his opinion. Ocean Cty. v. Landolfo, 132 N.J.Super. 523, 528, 334 A.2d 360 (App.Div.1975). The weight and value of expert testimony are for the trier of the facts. Robbins v. Thies, 117, N.J.L. 389, 398, 189 A. 67 (E. & A.1937). An expert’s opinion may be adopted in whole or in part or completely rejected. Middlesex Cty. v. Clearwater Village, Inc., 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978) certif. den. 79 N.J. 483, 401 A.2d 239 (1979). [Atlantic City v. Atlantic Cty. Bd. of Tax., 2 N.J.Tax 30, 42-43 (Tax Ct.1980), aff’d 4 N.J.Tax 685 (App.Div.1982)]
In the cost approach, estimating accrued depreciation by the sales comparison approach, or the abstraction method as plaintiff’s witness calls it, is an accepted method for estimating depreciation from all sources, i.e., physical, functional or external. The Appraisal of Real Estate, supra at 400. The validity *375 of this method, of course, depends on the sales comparison data used. By this method, the sale price of the comparable is first determined. From the sale price, the estimated land value is deducted, leaving a value for the improvements. The estimated cost of reproduction new of the improvements on the date of the sale is then determined. The value of the improvements is then deducted from the cost of the improvements and the difference is the indicated total accrued depreciation in dollars. In the present case, plaintiff’s expert went a step further. He made a normal age-life analysis of the comparable properties thereby determining physical depreciation. Then he allocated all remaining depreciation to what he called “special functional obsolescence.” The analysis for each sale appears in the appraisal, and the testimony of the witness essentially repeated the figures set forth in the analysis for each comparable sale.
In explaining his cost approach, the witness testified that his accrued depreciation analysis with regard to comparable sale number one used land sales for the subject property, i.e., sales used to value the land of the subject property in the cost approach. No effort was made to value the land in comparable sale number one for purposes of determining depreciation. Nor was there any evidence of the manner in which land values were determined for the other comparable sales in the accrued depreciation analysis. Obviously, if the land values are incorrect, the dollar amounts of accrued depreciation would be incorrect.
In addition, physical depreciation was based strictly on the age of the comparable sale property and the straight-line depreciation method without regard to the actual physical condition of the property. For each comparable sale, in the accrued depreciation analysis, cost was determined by the witness’ first costing the subject property and then adjusting that cost to arrive at a cost per square foot of the comparable property. No effort was made to cost each of the individual comparable sale properties for the accrued depreciation analysis. However, the procedure used by the witness in abstracting depreciation *376 from the market requires that each comparable be costed. “In estimating accrued depreciation with sales comparison techniques, the reproduction or replacement cost of the property on the date of the appraisal minus the value contribution of the improvements on the same date should equal total accrued depreciation.” The Appraisal of Real Estate, supra at 400; emphasis supplied. The methodology used by the witness in this regard is improper and unacceptable. The proper method for using an abstraction of depreciation from the market analysis is to cost each individual property which is a comparable.
Finally, the witness made no analysis of economic obsolescence, merely lumping all depreciation, other than physical deterioration, into the category of functional depreciation and concluding that the subject suffered from the same amount of functional obsolescence. There is no testimony from plaintiff concerning any external factors affecting the subject property or the comparables. It is clear, however, from the locations of the comparable properties, their uses and the market forces impacting on them, that some or all of them suffered from economic obsolescence.
Allocating all depreciation, other than physical, to functional obsolescence is simply not correct. For all of these reasons, the cost approach used by plaintiff is unacceptable, will be given no weight and will, in effect, be disregarded.
The “common sense of the situation” and the dictates of N.J.S.A. 54:4-23 require that the valuation of real property result in a fair and reasonable distribution of the local property tax burden of a municipality among its property owners. See Youngman, “Defining and Valuing the Base of the Property Tax,” 58 Wash.L.Rev. 715 (1983). This is achieved in this case by valuing plaintiffs property as a viable glass container manufacturing plant by the cost approach and not by valuing it as a vacant plant about to be converted to a multi-tenant, general-purpose use.
*377 In addition to the usual considerations in appraising real property which support such a conclusion, it should also be noted,
that there is no reason and principle why we have to exclude the owner from the market. It may well happen that there is only one person in the market and that is the present owner, and maybe we shouldn’t be using the maximum value that the present owner would be willing to put into the property. But we ought to use, at least as a minimum, the cost of building the facility which is the way most of these cases do come out in the end. What is never clear is how the Court reached their results. But they could reach their decisions very easily by concluding that we should not exclude the owner himself from the market as long as he is actually using the property for the purposes for which it was designed. Then you can get very easily to the natural result. [Woolery, The Art of Valuation (1978) at 53 (quoting Oliver Oldman, Learned Hand Professor of Law and Director of the International Tax Program, Harvard Law School, and Faculty Advisory Committee Member, Lincoln Institute of Land Policy)]
The evidence before me preponderates in favor of a determination that the value of the subject property is $14,422,000 for the tax year 1984 and $14,457,000 for the tax year 1985. These conclusions are based on my determination that the cost approach is the correct approach for valuing the subject property and my findings of fact, based on the totality of the evidence, that the subject property does not suffer from functional or economic obsolescence. In accordance with the stipulations between the parties, the cost of reproduction new of the subject property as of October 1, 1983 was $19,800,000 and as of October 1, 1984 was $19,850,000. Thirty percent is to be deducted from the cost of reproduction new for physical depreciation for each of the two years before me in accordance with the stipulation between the parties. Since there is no functional or economic obsolescence, the value of the land and improvements is determined from the stipulations.
There is another aspect of the valuation process. Plaintiff did not value the furnaces on the property, claiming that they constitute personal property. Plaintiffs position is based on N.J.S.A. 54:4-l.b. and evidence which plaintiff claims proves that the furnaces are machinery, apparatus or equipment which are not functionally essential to the structure nor structures themselves. Plaintiff claims that its position is supported by N.J.A.C. 18:12-10.1 and -10.2, adopted by the Director, Division *378 of Taxation, effective December 19, 1988, under the authority of N.J.S.A. 54:4-l(b) and -1.12. Defendant, however, argues that the furnaces are real property, and it presented evidence of their value in addition to the value of the land and the other improvements. Basically, defendant argues that the furnaces are real property because they are structures or buildings in themselves. In the alternative, defendant argues that, if the furnaces are to be considered personal property, they are affixed to the real property and do not come under the provisions of N.J.S.A. 54:4-l.a., the severance provision of the statute. In addition, defendant argues that, if personal property, the furnaces are machinery, apparatus or equipment functionally essential to the structure, or they are structures themselves. Defendant relies on Chevron U.S.A., Inc. v. Perth Amboy City, 9 N.J.Tax 205 (Tax Ct.1987).
It is, however, not necessary for me to determine, in the context of the present case, whether the glass manufacturing furnaces are real property, or personal property which cannot be severed from real property, or personal property functionally essential to the structure, or personal property which are structures. The reason is that the evidence of the value of the furnaces was inconclusive, based as it was, to a large extent, on the cost of repairing the furnaces. Accordingly, whether real or personal property, I am not able to conclude an appropriate valuation for the furnaces by a preponderance of the evidence, Samuel Hird and Sons, Inc. v. Garfield, 87 N.J.Super. 65, 74, 208 A.2d 153 (App.Div.1965). Cf. Ford Motor Co. v. Edison Tp., 10 N.J.Tax 153, 201 (Tax Ct.1988).
Having determined the value of the property for each of the two years before me, it is necessary to determine the correct assessment for each of the two years by reference to chapter 123,[5] the appropriate guide to determine if there has been discrimination against either the taxpayer or the municipality by the assessments. The chapter 123 ratios for the municipali *379 ty for the tax years 1984 and 1985, and the limits of the common level range for each year, are as follows:[6]
Lower Limit Ratio Upper Limit
1984
81.80 96.24 110.68
1985
78.06 91.84 105.62
The ratio of the assessment to the value for the year 1984 is 76.27% ($11,000,000 h- $14,422,000). Since this ratio is below the lower limit of the common level range for that year, the correct assessment is determined by multiplying the value determined for that year by the chapter 123 ratio for that year, and it is $13,879,732.80 ($14,422,000 X 96.24%), or $13,880,000 rounded. The Clerk of the Tax Court will enter a judgment for 1984 as follows:
Land $ 702,500[7]
Improvements 13,177,500
Total $13,880,000
The ratio of the assessment to the value for the year 1985 is 76.09% ($11,000,000 -7- $14,457,000). Since this ratio is below the lower limit of the common level range for that year, the correct assessment is determined by multiplying the value determined for that year by the chapter 123 ratio for that year, and it is $13,277,308.80 ($14,457,000 X 91.84%) or $13,277,000 rounded. The Clerk of the Tax Court will enter a judgment for 1985 as follows:
Land $ 702,500 [8]
Improvements 12,574,500
Total $13,277,000

These areas total 936,566 square feet, but the parties stipulated that the improvements have a total of 926,000 square feet.

One of the conditions of the sale was the removal of the glass furnaces from the property by the seller.

This was the witness’ testimony. His appraisal states 1978.

This was the witness’ testimony. His appraisal states approximately 80%.

N.J.S.A. 54:51A-6.

Certification of Average Ratios and Common Level Range for Use in the tax year 1984, State of New Jersey, Department of the Treasury, Division of Taxation, April 1, 1984, and for use in the tax year 1985, April 1, 1985.

For administrative purposes, the original land assessment is carried forward in the Tax Court judgment.

For administrative purposes, the original land assessment is carried forward in the Tax Court judgment.