NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1498-16T3
A-1500-16T3
A-1509-16T3

MERRILL CREEK RESERVOIR
c/o PROJECT DIRECT,

    Plaintiff-Appellant/
    Cross-Respondent,

v.

HARMONY TOWNSHIP,

    Defendant-Respondent/
    Cross-Appellant.

_____

APPROVED FOR PUBLICATION

August 22, 2019

APPELLATE DIVISION

Argued January 16, 2019 - Decided August 22, 2019

Before Judges Fuentes, Accurso and Vernoia.

On appeal from the Tax Court of New Jersey, Docket Nos. 010290-2011, 004562-2012 and 004474-2013, whose opinion is reported at 29 N.J. Tax 487 (Tax 2016).

Frank E. Ferruggia argued the cause for appellant/cross-respondent (Mc Carter & English LLP, attorneys; Frank E. Ferruggia, of counsel and on the briefs; Farhan Ali, on the briefs).

Lawrence P. Cohen argued the cause for respondent/cross-appellant (Lavery Selvaggi Abromitis & Cohen, attorneys; Lawrence P. Cohen, of counsel

and on the briefs; William Henry Pandos, on the briefs).

Thomas J. Denitzio, Jr., argued the cause for amicus curiae Royal Institute of Chartered Surveyors (Greenbaum Rowe Smith & Davis, LLP, attorneys; Thomas J. Denitzio, Jr., of counsel and on the brief; Emily A. Kaller, on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

In these consolidated appeals, plaintiff Merrill Creek Reservoir c/o Project Direct, a consortium of electric utility companies and owner of the Merrill Creek Reservoir in Harmony Township, challenges three 2016 Tax Court judgments affirming the 2011-2013 tax assessments on its property. Harmony cross-appeals alleging error in adjustments the Tax Court made to value. Merrill Creek, although conceding the improvements should be valued using the cost approach the Tax Court employed, argues the court erred in accepting the Township's trend analysis, which it characterizes as "a rarely used valuation methodology, discredited by New Jersey Tax Court precedent," instead of its own quantity survey method. Because we find no error in the court's acceptance of a trend analysis in this case or its adjustments to value based on the evidence adduced at trial, we affirm.

The case was tried over the course of seven days. Certain facts are undisputed. The reservoir property consists of ten parcels totaling 840 acres in

Harmony. The reservoir, which has a capacity of over sixteen billion gallons of fresh water, spans 650 acres. The remainder of the property not vacant land contains major improvements including a main dam, several smaller saddle dikes, a spillway, a conservation outlet, pipes and tunnels to transfer the water, a pumping station, an electric substation, an inlet/outlet tower containing equipment to regulate water flow, a maintenance building and a visitor center.

The reservoir was constructed between 1985 and 1988 following a directive from the Delaware River Basin Commission. It was designed to provide fresh water to offset consumptive use by electric power plants located along the Delaware River during droughts. The reservoir is part of a larger network of reservoirs that serve the Delaware by providing water in times of drought and low flow conditions. Although the reservoir makes regular releases of water for conservation purposes, there have been only four ordered large-scale releases to counter drought conditions since construction was completed in 1988.

Construction of the reservoir was led and supervised by Public Service Electric and Gas Company (PSE&G), one of the members of the owning consortium, acting on its behalf as the "managing utility." The sole fact witness at trial was Robert Uniszkiewicz, manager of construction estimating for PSE&G, and a thirty-four-year employee of the company. He manages a

group of civil, electrical and mechanical estimators responsible for estimating construction-related costs for all PSE&G projects. Uniszkiewicz was tasked by PSE&G to estimate the costs of building the Merrill Creek Reservoir.

The parties stipulated the highest and best use of the property is as a reservoir, and that the cost approach is the appropriate method for valuing the improvements. They also stipulated the fair market value of the land for tax years 2011 through 2013 was $4,800,000. They stipulated to the qualifications of all experts testifying at trial and to the admission of their reports. Finally, they agreed the total assessment of the property was $220,822,300 for tax years 2011 and 2012, and $220,725,800 for 2013.

Each side presented a real estate appraisal expert and an expert who estimated costs of construction of the improvements. The parties and their experts having agreed that the cost approach was the best indicator of fair value for this special purpose property, see Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445, 452 (Tax 1980), aff'd, 180 N.J. Super. 366 (App. Div. 1981), the focus of the expert testimony at trial was on their differing methods for calculating the cost of reproducing or replacing the reservoir and its attendant improvements, see Int'l Flavors & Fragrances, Inc. v. Union Beach Borough, 21 N.J. Tax 403, 417 (Tax 2004) (explaining the two elements to a

cost approach as "land value and the reproduction or replacement cost of the buildings and other improvements").

Merrill Creek's experts employed the quantity survey method, described in The Appraisal of Real Estate as "[t]he most comprehensive method of cost estimating." Lawrence Assocs. v. Lawrence Twp., 5 N.J. Tax 481, 526 (Tax 1983) (quoting American Institute of Real Estate Appraisers, The Appraisal of Real Estate 216 (7th ed. 1978)).

> In its strictest application, it is a repetition of the contractor's original process of developing a bid figure. A quantity survey is computation of the quantity and quality of all materials used and of all categories of labor hours required, to which unit cost figures are applied to arrive at a total cost estimate for materials and labor. To this are added estimates for other contractor costs such as permits, insurance, equipment rental, field office, supervision, and other overhead, plus a margin for profit.
>
> [Ibid. (quoting The Appraisal of Real Estate 216-17 (7th ed.)).]

Joseph Novelli, Merrill Creek's expert construction cost estimator, testified as to how he prepared an estimate of the cost to reproduce new the reservoir improvements less depreciation for the tax years at issue. See Gale & Kitson Fredon Golf, L.L.C. v. Twp. of Fredon, 26 N.J. Tax 268, 283 (Tax 2011) (explaining the cost approach involves "a replication, through the use of widely accepted cost services . . . of the cost of the components of the building

to be valued, less . . . depreciation" (quotation omitted)).  Visiting the site, inspecting the improvements and using the "as-built" drawings, he performed a "quantity takeoff" by identifying the materials used to construct each component of all improvements, calculating dimensions where necessary, and estimating the quantities used in construction.  He then consulted the RSMeans Manual, a nationally recognized publication that provides construction cost surveys relied upon by appraisers and cost estimators, to ascertain the cost of each item.  Novelli testified he multiplied the quantity of each material by its code in the RSMeans manual.  He applied time and location modifiers and the RSMeans software provided him the total cost for each component including labor at union rates.  For the few items without an RSMeans code, he consulted the Marshall and Swift Valuation Service, another widely accepted building cost manual, see Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 181 (Tax 1988), aff'd, 127 N.J. 290 (1992), called suppliers or vendors or estimated the cost based on his own experience.

After costing out every component on the as-built plans using the quantity survey method, Novelli summed them to obtain total "hard" costs, representing material and labor, for each tax year.  To those amounts, he added a five percent contingency to account for extra work due to unforeseen conditions or changes, ten percent for general conditions, and ten percent for

general contractor overhead and profit. Novelli then added 14.25 percent in "soft" costs, consisting of items such as architectural fees, engineering fees, insurance and legal fees. Novelli testified he found total hard and soft costs of $192,370,411 for tax year 2011; $202,214,888 for tax year 2012; and $200,301,947 for tax year 2013.

Finally, Novelli deducted depreciation from each component using the "age-life" method. See Brockway Glass Co. v. Twp. of Freehold, 10 N.J. Tax 356, 367 (Tax 1989) (explaining "in the cost approach, depreciation from all causes is subtracted from the cost of reproduction new as representing a loss in property value"), aff'd, 12 N.J. Tax 263 (App. Div. 1991). He first determined the estimated useful life for each component and divided it by its effective age to derive a depreciation factor, which he applied to reduce the cost of the component. Novelli found final depreciated hard and soft costs of $128,962,021 for tax year 2011; $132,888,329 for tax year 2012; and $128,632,204 for tax year 2013.

Mark Sussman, Merrill Creek's real estate appraisal expert used Novelli's cost estimates as the basis for his proposed valuation of the property. Sussman worked with Novelli in developing the component-based depreciation analysis Novelli applied to determine depreciated hard and soft costs for each tax year. Sussman further reduced the value of the improvements by fifteen

percent for functional obsolescence, reasoning that a reservoir of substantially less capacity would have been sufficient in light of the limited number of times the Delaware River Basin Commission has ordered the release of water into the river.  See CPC Int'l, Inc. v. Englewood Cliffs, 193 N.J. Super. 261, 265 (App. Div. 1984) (explaining functional obsolescence as a term to describe the reduction of an improvement's market value based on costly features installed to please the owner or unique to the improvement's special purpose that do not enhance market value).

Sussman considered and rejected adding an "entrepreneurial profit" factor to the project's costs, representing a value enhancement for the developer's expectation of a reward or the anticipation of entrepreneurial profit, because the consortium only built the reservoir after being directed to do so by the Delaware River Basin Commission.  See Westwood Lanes, Inc. v. Borough of Garwood, 24 N.J. Tax 239, 249 (Tax 2008) (noting New Jersey courts include entrepreneurial profit where improvements were made to property with the anticipation of realizing a profit on sale).  Using Novelli's hard and soft cost estimates and depreciation analysis, applying a functional obsolescence factor and adding the stipulated land value, Sussman opined the total value of the property was $104,905,000 for tax year 2011; $107,356,000 for tax year 2012 and $103,385,000 for tax year 2013.

In contrast, Harmony's experts relied on a "trend analysis," which involved looking at the actual costs of the project and applying a multiplier to trend those costs forward to the tax years. See Hackensack Water Co. v. Borough of Haworth, 178 N.J. Super. 251, 261 (App. Div. 1981) (explaining the elements of the trended original cost methodology). For proof of the actual costs of the improvements, Harmony relied on Uniszkiewicz, the head of construction estimating at PSE&G, who explained how he estimated the original cost of the reservoir project and how it compared to the actual cost the owners incurred in completing the project.

Uniszkiewicz testified that before construction began, he spent between two and three years working with an engineering firm to develop a construction cost estimate. In 1984, prior to construction, he estimated the total project would cost approximately $217 million to complete. He explained that figure was divided between "bid" and "risk," with bid representing the "contract face value for the job," and risk representing "all the issues that could happen from the base cost." He testified that of his initial

budget figure of $217 million, $136 million represented the base or "bid" and the remaining $30 million "risk assessment and contingency."[1]

Uniszkiewicz revised his estimates in 1986, changing the base "bid" as the scope of the project changed and modifying the "risk" or management reserve "based on the uncertainty of the project," but his predicted total project cost remained at $217 million. After construction, Uniszkiewicz calculated the project's actual costs and compared it to his estimate. The final actual cost of the project was approximately $215 million representing a base of $131 million and change orders of roughly $84 million, to which he added a punch list reserve of $5 million, representing a difference of roughly $2 to $3 million off his original estimate of $217 million. Uniszkiewicz agreed with Harmony's counsel that his estimate of $217 million was remarkably accurate given the size of the project.

Uniszkiewicz acknowledged, largely in response to cross-examination by Merrill Creek's counsel, the several difficulties PSE&G encountered during construction, including discord between PSE&G's project manager and the general contractor, leading to the project manager's replacement; thirty-nine days of rain at the start of construction, which delayed the schedule and

---

[1] Uniszkiewicz's estimate for bid and risk totaled $167.2 million. He testified the $217 million budget also accounted for acquisition costs, management services, utilities, engineering fees and construction management.

required the erection of a bubble over the site at a cost of over $300,000 to permit work to continue "in the winter as if it was summer"; and "a lot of environmental issues," including shutdown of the site for a month by the Warren County Soil Conservation District over sediment control. Uniszkiewicz testified the design of the project evolved "from beginning to the end." He explained that "[m]aterials were changing, the laydown areas were changing, the amount of materials were constantly changing," because "[a]s they did more engineering they found that they had to modify it as they went along."

Uniszkiewicz reviewed on cross-examination a letter from the general contractor from July 1986 complaining about PSE&G's mismanagement of the project and the attendant delays, disruption and escalating costs. Specifically, the contractor complained of deficiencies in the project design, inefficiency of the site organization, interference from the environmental regulators, differing site conditions "of a surprising magnitude" and the adverse weather. Uniszkiewicz agreed with Merrill Creek's counsel that the contractor's claims resulted in a number of requests for additional payment in the form of change orders.

On redirect, Uniszkiewicz conceded the general contractor's July 1986 letter was typical of the types of letters PSE&G regularly received from

11

contractors attempting to establish a basis for additional payments on a project. Uniszkiewicz agreed with Harmony's counsel that his estimate anticipated unforeseen costs, and that some of those costs, such as those resulting from issues with the design and site conditions, would be the same if the construction were undertaken in 2010.

Uniszkiewicz was unable to quantify the degree of increased costs attributable solely to mismanagement or incompetence. He also acknowledged that some of the change orders requested by the contractor actually decreased costs. Ultimately, Uniszkiewicz observed that even with all of the changes, the final cost of the project, including the punch list reserve for items to be completed after construction was finished, exceeded his estimate by only $3 million.

Eric Ditchey, a licensed civil engineer with a master's degree in geotechnical engineering who specializes in working on dams and hydraulic structures, testified for Harmony about the costs of construction. He testified he had been involved in the design of ten or twelve new dam projects and sixty or seventy dam rehabilitation projects, as well as in the construction of twenty to twenty-five dam related projects. Ditchey explained he was asked by Harmony to review the Merrill Creek Reservoir and develop what it would cost to build in 2010, 2011 and 2012 dollars and to give an opinion on what

the service life of the reservoir should be and what an appropriate method of depreciation would be, based on his experience in the design and construction of such projects.

Ditchey testified he inspected the site and reviewed the as-built plans for the reservoir, several inspection reports and Uniszkiewicz's 1986 cost estimate and final cost compilations. He determined to trend the original costs of construction because in his professional opinion, the design and construction of the dam remained "perfectly appropriate" despite the passage of time. He testified that if the reservoir were constructed today it would be built in the exact same way it was built in the 1980s. There would be no changes in the design, the methods of construction or the materials used. Ditchey also testified that no aspect of the project would cost less.

Ditchey testified he considered, and rejected, a component cost analysis because he did not believe he could come up with an accurate number for cost of construction given the complexity of the project and the inability to ascertain some of the specifics of the construction. According to Ditchey, having access to the level of detail provided by Uniszkiewicz's cost compilations was a great advantage in accurately calculating the cost of reproducing the reservoir during the tax years at issue by trending the costs forward.

A-1498-16T3

Ditchey analyzed PSE&G's cost compilations and the as-built drawings to determine how much the improvements actually cost at the time of construction. He determined the total cost, including both hard and soft costs, was approximately $215 million. But after deducting more than $11 million for the value of the real estate and the cost of some furnishings in the visitor's center he considered should be categorized as personal property, he concluded the actual cost of constructing the improvements in 1988 would be $203,934,813. He testified based on his experience in designing dams and reservoirs and supervising their construction that $203,934,813 would have been a reasonable cost for construction in 1988, considering the complexity of the project.

Ditchey then "trended" the historical costs forward to determine what the cost of the improvements would be if the project were constructed in tax years 2011, 2012 and 2013. To derive a trending factor, Ditchey consulted the RSMeans historical cost indices, the Consumer Price Index, the Construction Cost Index and the Building Cost Index. He relied most heavily on the RSMeans indices because they dealt specifically with heavy construction, appropriate for a reservoir project. He concluded the project's trended cost, before depreciation, was $416,027,019 for tax year 2011; $434,381,152 for tax year 2012; and $440,499,196 for tax year 2013.

Ditchey testified he regularly employed the same trending analysis when he developed an engineer's estimate of construction costs for clients replacing or rehabilitating a dam or reservoir built fifteen or twenty years before. He explained his firm would look at the original cost of construction and use the RSMeans indices to calculate what it would cost to construct the same project today, which the client would then use as a benchmark in putting the project out for bid. Ditchey testified that trending original construction costs for dams and reservoirs using the RSMeans indices was "common practice," and that based on his experience, the trended figures he computed represented a reasonable cost of constructing the Merrill Creek Reservoir in the tax years in question.

Ditchey testified he calculated depreciation by assigning the entire reservoir a service life of 100 years, the same service life the New Jersey Water Supply Authority assigned to the Manasquan Reservoir built at roughly the same time. Ditchey determined straight line depreciation would be most appropriate for the reservoir and thus divided the chronological age of the structure by 100 years to obtain the depreciation factor. Ditchey readily acknowledged that some components of the project, such as the visitor's center or certain mechanical parts, might last less than 100 years. He testified, however, that the mechanical components were not subject to abuse and

Merrill Creek was one of the best maintained facilities he had ever seen. He believed that with proper maintenance the reservoir could last 200 years. Ditchey concluded the design and construction of the reservoir and the way it was maintained actually made his 100 year service life a conservative estimate. He calculated trended costs after depreciation as $324,256,353 for tax year 2011; $334,453,093 for tax year 2012; and $336,492,441 for tax year 2013.

In response to questions from the court about the reliability of Novelli's quantity takeoff analysis, Ditchey explained why he thought it less reliable than trending original costs in the case of dams and reservoirs. According to Ditchey, dam engineering and construction is different from the cost estimating associated with the construction of buildings because the majority of the work on a dam is in the foundation well below grade where it is difficult to fully assess conditions ahead of construction.

Ditchey explained that although dam engineers would typically take core samples and run permeability tests to get a sense of the kind of seepage they could expect through the foundation rock, "there's only a limited number of holes you can drill during the investigation or design phase," making it "unlikely that you're going to really understand the full and true permeability of the rock." Ditchey explained it was thus very common to find conditions

A-1498-16T3

worse than anticipated "just because your borings didn't hit all the porous areas when you did the subsurface investigation program."

Because there are typically so many unknowns, Ditchey explained that for dam engineers and general contractors to "have an actual bid and/or construction costs from a dam project, regardless of the age of that data is very, very important." He readily acknowledged that the actual costs on which he relied included multiple change orders that made construction more expensive, but he contended many of them were the result of difficult site conditions that any contractor would have encountered. He maintained those change orders represented

> a real cost that . . . needed to be spent to build that reservoir. So, accepting that and in trending that forward to me is totally appropriate. To do the component approach by just taking quantities off the as-builts then going to Means to get a unit price, there was no way to include some of those costs that the contractor had to incur.

Ditchey used the "borrow material" to illustrate his point. Merrill Creek is an earthen dam. Ditchey explained that he did not know where the contractor got the soil and rock or "borrow material" used in the dam, but assumed the majority was pulled from a borrow pit "on-site relatively close to where the embankments were constructed," as that is "the only way a project like this with this many millions of cubic yards could be constructed

A-1498-16T3

economically."  Ditchey explained he "didn't have to worry about where they got it because" it was already "included in [his] cost where the contractor got the material and how far he had to take it to put it into the dam."  In contrast,

> [t]o do the component approach, the person doing it, Mr. Novelli, would have to make some assumptions on where that material was gotten, you know, where the borrow sources were, how far they were and I don't know how he would do that. . . .  I didn't see the information on the as-builts and I think that's what he said, as well.  He didn't know that — how far away the material had to come from.

When Merrill Creek's counsel asserted that the unforeseen conditions and the materials and methods for dealing with them would all be reflected on the as-built drawings, Ditchey replied, "[n]ot necessarily."  He explained:

> If there was a change in quantity or an addition of a material[,] that would be shown on the as-builts, but if say the material that they intended to use for the core [of the dam], as an example, if it came out of the borrow area much wetter than they anticipated, they would have to then do extra effort to dry that material or get it to a certain moisture content.[2]  That would be an added cost that, I don't know where or how they would reflect that on the as-builts.

Ditchey asserted that for someone trying to assess what it might cost to replicate a dam project, "how a contractor chooses to bid that work or how the

---

[2] Uniszkiewicz testified the rain made the soils wetter than what the engineers deemed acceptable for the dam, requiring the contractor to dry them out before using it in the construction.

ultimate cost works out because of change orders associated with those unknowns, that's all very valuable." Ditchey concluded that for him and he believed it "standard practice within the engineering community, the compilation of these bid tabulations from previous projects, we as dam engineers put a lot of value on that and having that type of information, [and] being able to trend it forward."

Harmony's real estate appraisal expert was Louis Izenberg. He agreed with Ditchey's use of a trend analysis to determine market value of the reservoir improvements because the trended cost approach relied on fewer "hypotheticals" than the quantity survey approach in replicating costs of construction of the reservoir. He explained that the inability to obtain precise information about the quantities of the material used in the dam resulted in "that first input if you will [having] to be an opinion of someone else and that follows for the next thousand inputs — that it was an opinion based upon opinion."

Izenberg asserted that because the reservoir would be built in the exact same way if constructed in the applicable tax years, the trended cost approach was most appropriate in calculating value because it accorded great weight to the project's actual cost. Izenberg's report states he calculated replacement cost, rather than reproduction cost, but he testified the trending multiplier takes

into account modern materials and methods, thus making reproduction and replacement virtually the same in this case.

Izenberg used Ditchey's calculated actual cost of $203,934,813 as his baseline figure for the actual cost of the improvements in 1988. He further reduced that number to approximately $199 million by deducting amounts he determined were linked to land acquisition, rather than improvements. After reviewing Ditchey's report and the Marshall & Swift Valuation manual, Izenberg used a double trending multiplier for tax year 2011, meaning the cost to build the dam in 2011 would be twice what it cost in 1988. Izenberg increased that multiplier by three percent in tax years 2012 and 2013, thus applying a multiplier of 2.060 in 2012 and 2.120 in 2013. After applying the multipliers to the base cost, his calculated replacement cost was approximately $398 million for tax year 2011, $410 million for tax year 2012, and $422 million for tax year 2013.

Izenberg also added an entrepreneurial incentive factor of ten percent to further increase the replacement costs in each tax year. He testified he did so because the concept of market value embodies the majority of behaviors that people involved in real estate would undertake and most people invest in real estate for profit, although he acknowledged the reservoir was not built for profit or resale. With that factor included, the total replacement cost was

approximately $438 million for tax year 2011, $451 million for tax year 2012, and $464 million for tax year 2013.

Izenberg testified he rejected functional obsolescence because he found nothing in the discovery to support a finding of excess capacity, and certainly nothing from the Delaware River Basin Commission to that effect. He then applied a depreciation factor to the total costs, using the age-life method. His approach differed from that of Sussman, who had engaged in a component-by-component depreciation analysis for every improvement on the property. Izenberg found an effective age of twenty years for the improvements for all three tax years. He found a 100-year useful life for the reservoir as a whole, and applied a twenty percent depreciation factor for each tax year.

After reducing for depreciation and adding the stipulated land value, Izenberg's final market value estimate for each tax year in rounded dollars was $355,000,000 for tax year 2011; $365,750,000 for tax year 2012; and $375,250,000 for tax year 2013.

On cross-examination, Izenberg was queried about the reasonableness of trending construction costs consisting of a $131 million base bid and $84 million in change orders. He took issue with the assumption that change orders were synonymous with cost overruns in light of Uniszkiewicz's pre-bid cost estimate, and his testimony that total cost of construction was within $3

21

million of PSE&G's original estimate. Izenberg emphasized that the contract came in within budget and on schedule, making trending those costs the most credible method of estimating what it would cost to build the same reservoir in the exact same manner in 2010 and the ensuing tax years.

The Tax Court judge found both parties' experts "produced generally credible valuation reports and rendered credible testimony." Merrill Creek Res C O Proj. Direct v. Harmony Twp., 29 N.J. Tax 487, 495 (Tax 2016). He concluded, however, that "the testimony and cost conclusions of Harmony's cost estimator," an engineer specializing in the design and construction of dams, was "more compelling" and the trended cost approach used by Harmony's appraisal expert was "most appropriate" on the facts. Id. at 495-96.

The judge agreed with Harmony's appraisal expert that in assessing true value of the reservoir, there was no difference between reproduction and replacement costs. Id. at 496. Finding the trended original cost approach "an accepted methodology," id. at 498 (citing Transcon. Gas Pipe Line Corp. v. Bernards Twp., 111 N.J. 507, 542 (1988)), the judge found any concern about its reliability given the age of the reservoir was assuaged by the undisputed testimony "that the reservoir would be built the exact same way today as it was in the 1980s" and the accuracy of the original costs of construction, ibid.

Although accepting Harmony's cost trending analysis, the Tax Court rejected inclusion of entrepreneurial incentive, agreeing with Merrill Creek that "the reservoir was built because the [Delaware River Basin Commission] required it be built" and "profit was not the primary motivation." Id. at 499-500; see Tex. E. Transmission Corp. v. E. Amwell Twp., 13 N.J. Tax 24, 42 (Tax 1992), aff'd, 18 N.J. Tax 126 (App. Div. 1999).

The Tax Court was also persuaded by Merrill Creek's argument about the excess capacity of the reservoir, finding its "expert provided credible evidence for a 15% deduction for functional obsolescence due to an incurable superadequacy." Merrill Creek, 29 N.J. Tax at 502. Acknowledging "[t]he use of replacement cost can eliminate the need to measure many, but not all, forms of functional obsolescence such as superadequacies and poor design," ibid. (quoting Appraisal Institute, The Appraisal of Real Estate 386 (13th ed. 2008)), the court noted replacement cost should, in theory, "implicitly eliminate functional obsolescence," ibid. The Tax Court found, however, that although Harmony's experts acknowledged design factors, including the reservoir's size and the infrequent discharge orders, "its limited sedimentation load that enhances its effective capacity and function, its current capacity to handle future rainfall and seismic activities, and its anticipated continued

23                                                    A-1498-16T3

functionality due to superior maintenance," they "failed to account for much of the excess construction costs testified to by Merrill Creek's witness." Ibid.

Adopting Harmony's cost approach adjusted to eliminate entrepreneurial incentive and apply a fifteen percent deduction for functional obsolescence, the Tax Court arrived at a true value of $263,700,000 for tax year 2011; $271,461,000 for tax year 2012; and $279,022,000 for tax year 2013. Id. at 503. Although the valuations exceeded the assessments for each tax year, and Harmony filed counterclaims, the ratios between the court's true values and the original assessments being within permissible Chapter 123 limits, see Glen Wall Assocs. v. Twp. of Wall, 99 N.J. 265, 271 n.2 (1985) (explaining "[t]he 'Chapter 123 ratio' is the average ratio of assessed value to market value of all property in a town or tax district," (citing N.J.S.A. 54:51A-6)), the court affirmed the assessments, Merrill Creek, 29 N.J. Tax at 503.

Merrill Creek appeals, arguing the Tax Court erred in using a cost trend analysis based on inflated and unreliable historic costs going back over twenty years. Amicus Royal Institute of Chartered Surveyors echoes Merrill Creek's arguments.[3] Harmony cross-appeals, arguing the court erred in disallowing entrepreneurial incentive and allowing a deduction for functional obsolescence. Our review of the record convinces us that none of these

_____

[3] Merrill Creek is paying amicus's fees and costs in this court.

24                                                      A-1498-16T3

arguments is of sufficient merit to warrant extended discussion in a written opinion. See R. 2:11-3(e)(1)(E).

The scope of our review of judgments of the Tax Court is, of course, limited. United Parcel Serv. Gen. Servs. Co. v. Dir., Div. of Taxation, 430 N.J. Super. 1, 7 (App. Div. 2013). Because "[t]he judges presiding in the Tax Court have special expertise . . . their findings will not be disturbed unless they are plainly arbitrary or there is a lack of substantial evidence to support them." First Republic Corp. of Am. v. Borough of E. Newark, 17 N.J. Tax 531, 536 (App. Div. 1998) (quoting Glenpointe Assocs. v. Twp. of Teaneck, 241 N.J. Super. 37, 46 (App. Div. 1990)).

The Tax Court reviews challenged property tax assessments pursuant to N.J.S.A. 54:3-21. "The settled rule is that there is a presumption that an assessment made by the proper authority is correct and the burden of proof is on the taxpayer to show otherwise." 125 Monitor St. v. City of Jersey City, 23 N.J. Tax 9, 13 (App. Div. 2005) (quoting Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 105 (1952)). The taxpayer must present "sufficient competent evidence to overcome the presumption, that is, to establish a true valuation of the property at variance with the assessment." Ibid. "Such evidence must be definite, positive and certain in quality and quantity to overcome the presumption." Ibid. Once the presumption is overcome, "[t]he

court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Twp. of Edison, 127 N.J. 290, 312 (1992) (citation omitted).

Applying those standards here, we find no error in the Tax Court's use of a trended cost analysis to value the Merrill Creek Reservoir, a textbook example of a special purpose property. As our Supreme Court has observed, there is no single "approach that must be followed in valuing real property." Pantasote Co. v. City of Passaic, 100 N.J. 408, 414 (1985). "There can be no rigid rule. The answer depends upon the particular facts and the reaction to them of experts." New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963).

Contrary to Merrill Creek's assertion, trended cost analysis is not "discredited by New Jersey Tax Court precedent," although it is likely correct the methodology is somewhat rarely used, at least in comparison with other methods employed in a cost approach in the reported cases. But it is easy to see why. Trended cost analysis is most often used in valuing true special purpose properties, see Transcon., 111 N.J. at 542; Hackensack Water Co. v. Old Tappan, 77 N.J. 208, 217 (1978), which are relatively rare things, see Ford Motor Co., 127 N.J. at 312; see also, The Appraisal of Real Estate 397 (13th

ed.) (noting cost index trending is "useful for estimating the current cost of one-of-a-kind items when standard costs are not available").

The Tax Court was correct that trended cost analysis is a perfectly acceptable valuation method in this state in the right circumstances, and one our Supreme Court has specifically endorsed. See Transcon., 111 N.J. at 542 (noting "the trended original cost approach, suggested in Hackensack Water Co., 77 N.J. at 217-18, and outlined in Haworth, [178 N.J. Super. at 261], . . . may in some cases be a more convenient valuation methodology" for equitably calculating replacement costs of special purpose property). We likewise affirmed the Tax Court's use of a trended cost analysis in valuing "a 'one of a kind' corporate headquarters of unique design" in Beneficial Facilities Corp. v. Peapack & Gladstone Borough, 11 N.J. Tax 359, 375 (Tax 1990), aff'd, 13 N.J. Tax 112, 113 (App. Div. 1992).

Moreover, there was ample substantial credible evidence to support the Tax Court judge's finding that the trended cost approach produced the best approximation of the reservoir's true value in the tax years at issue. Merrill Creek presented no evidence to rebut Ditchey's testimony that the dam and reservoir would be built the same way today as it was in the late 1980s with no changes in the design or the means and method of construction. That testimony undercut one of the practical limitations of the trended cost method,

namely, that "as the time span increases, the reliability of the current cost indication tends to decrease." The Appraisal of Real Estate 397 (13th ed.).

The other practical limitation in applying the cost trending method, ascertaining the accuracy of historical costs, was also not an impediment here. Not only were detailed cost compilations of the construction readily available, Uniszkiewicz, the PSE&G employee responsible for estimating the costs of the reservoir project in the 1980s, remained at the company as manager of construction estimating and testified at trial. While Merrill Creek asserts in its brief that construction of the reservoir was an "unmitigated disaster," the trial testimony does not bear that out.

Uniszkiewicz, the only fact witness to testify at trial, testified the project was completed on time and under budget. When Merrill Creek's counsel asked if the "project [was] beset by cost overruns," Uniszkiewicz disagreed, replying "[t]here were a lot of changes that occurred that were part of the risk and not part of the base. . . . [W]e had the money in the budget . . . but we were hoping not to spend all those risk dollars up front like we did." Further, Uniszkiewicz was clear that a number of the "risk dollars" were spent as a result of design changes from unanticipated site conditions that would be the same regardless of whether the dam was built in 1988 or 2010. Uniszkiewicz's testimony

strongly supported Ditchey's opinion that those change orders represented "a real cost that . . . needed to be spent to build that reservoir."

The record simply does not support Merrill Creek's assertion that the "original costs being trended are inflated and unreliable." To the contrary, it provides ample support for the Tax Court's finding that the original construction costs of the reservoir were sufficiently reliable and reasonable to support trending them to ascertain true value.

We also reject Merrill Creek's argument that the Tax Court judge trended personal property costs of $19 million, thus violating the Uniformity Clause, or that Harmony's experts rendered net opinions because they could not identify the particulars of each item Merrill Creek asserts was personalty. The law is well settled that soft or indirect costs such as engineering and architect's charges, environmental site planning, interior design, the expenses of a landscape architect, the cost of bringing utilities to the site, project supervision, a traffic consultant, financing charges, interest and taxes during construction, insurance and legal fees are all properly included in the cost of improvements for the purpose of establishing true value. See Beneficial Facilities Corp., 11 N.J. Tax at 379.

Merrill Creek compiled a list of items from the cost sheet that it asserts constituted personalty that should not have been trended, including $13 million

for settling claims with the contractor, $4 million for public relations, and a list of smaller items such as $600,000 for the installation, maintenance and dismantling of the bubble that permitted work to continue through the winter months, a $441,000 premium for extended hours and cold weather concrete and $640,000 for emergency action sirens. Although the Tax Court did not address these items in its opinion, we cannot find the failure to do so constituted reversible error.

First, we note that Harmony's real estate appraisal expert trended costs of approximately $199 million, not the $220 million final costs including the $5 million punch list reserve. Izenberg used Ditchey's calculated actual cost of $203,934,813, including hard and soft items, as his baseline figure for the actual cost of the improvements in 1988 and further reduced that number to $199 million before trending the costs forward. Second, Uniszkiewicz testified that the disputed claims with the contractor were nothing out of the ordinary, suggesting the expenses could fairly be characterized as administrative expenses incidental to a $220 million construction project.

Finally, none of the specific items Merrill Creek identifies, the bubble, cold weather concrete, the public relations expense or emergency action sirens, impugns the Tax Court's implicit conclusion that Harmony carried its burden to show those items as fairly included in the real property tax assessment. See

Gen. Motors Corp. v. City of Linden, 20 N.J. Tax 242, 265 (Tax 2002). Other courts have considered public relations a reasonable expense incidental to construction of a controversial project, see Pub. Serv. Co. v. Town of Seabrook, 580 A.2d 702, 704 (N.H. 1990) (including public relations among indirect costs for Seabrook nuclear power plant), and the record supports a conclusion that the construction related items and emergency warning sirens are costs that any prudent person reproducing or replacing the reservoir would pay, see Transcon., 111 N.J. at 531. Merrill Creek's contention that the testimony of Harmony's experts should have been excluded as net opinion for their failure "to do a scintilla of due diligence in regard to the original historical costs" borders on the frivolous.[4]

---

[4] We also regard as meritless Merrill Creek's assertion that we should reverse this case based on an error in the opinion that Novelli, Merrill Creek's cost estimator, was an "engineer who specializes in contamination sites," while correctly observing that Ditchey was a licensed engineer who actually designed and supervised the construction of several dams. The Tax Court corrected its error to accurately describe Novelli as a real estate appraiser whose reservoir and dam-related experience was limited to cost estimation. In an amplification letter issued pursuant to Rule 2:5-6(c), the court noted the corrected factual error did "not change or affect the decision in the case in any way," but instead "reinforce[d] the court's finding that [Harmony]'s expert was 'more compelling.'"

Having reviewed the testimony of both experts, we readily agree. These were not two licensed engineers with different specialties. Ditchey was the only expert to testify with actual engineering experience in dam design and construction. His response to the court's questions about the reliability of

(continued)

The issues Harmony raises on its cross-appeal require but brief comment. The Tax Court's elimination of entrepreneurial incentive is consistent with Tax Court precedent. <u>See</u> <u>Tex. E. Transmission Corp.</u>, 13 N.J. Tax at 42 (declining to apply entrepreneurial incentive to a pipeline project "exclusively constructed by regulated operating companies for use in their business at costs which are passed through to the ratepayers"); <u>Lawrence Assocs.</u>, 5 N.J. Tax at 535-38 (applying entrepreneurial incentive as an element of market value of the Quaker Bridge Mall but not the highway overpass providing access to it because it was not constructed "with the expectation of earning a profit separate from that derived from the Mall itself").

Although the Tax Court's application of a fifteen percent deduction for functional obsolescence might be a closer question on this record, we find no reversible error. The Tax Court based its deduction for functional obsolescence on both excess construction costs and superadequacy, accepting the opinion of Merrill Creek's real estate appraisal expert Sussman that a reservoir of substantially less capacity would have been sufficient to accomplish the Delaware River Basin Commission's goal of providing a source

(continued)
Novelli's quantity takeoff analysis for producing an accurate cost estimate for reproducing the dam and reservoir makes the Tax Court's point obvious.

A-1498-16T3

of fresh water to offset consumptive use by electric power plants located along the Delaware River during droughts and low flow conditions. <u>Merrill Creek</u>, 29 N.J. Tax at 502.

The record support for that conclusion is thin, consisting of only a single document entitled "Strategy for Resolution of Interstate Flow Management Issues in the Delaware River Basin," prepared at the request of the Commission in 2004. That document, while stating the water flow yield for the reservoir during extreme drought conditions was double the consumptive use of the existing electrical grid, also notes, however, that the reservoir was designed to accommodate future needs. More important, there is nothing in the record as to why the reservoir was built to a sixteen billion gallon capacity. Without knowing whether the regulator required the existing capacity or whether it could be built smaller today, a conclusion on superadequacy is difficult. <u>See</u> <u>BP Pipelines (Alaska) Inc. v. State Dep't of Revenue</u>, 325 P.3d 478, 492-93 (Alaska 2014) (finding functional obsolescence for oversized pipeline based on use value as integral part of owner's oil business).

Resolution of whether functional obsolescence based on superadequacy was appropriate here is unnecessary, because the Tax Court also based its finding on excessive construction costs, which is supported by the record. <u>See</u> <u>Brockway Glass</u>, 10 N.J. Tax at 367 (noting "[f]unctional obsolescence is

measured by excess construction costs and/or excess operating expenses"). Although refusing to agree with Merrill Creek's counsel that the project was "beset by cost overruns," Uniszkiewicz acknowledged that over a month of rain at the start of construction and mismanagement leading PSE&G to replace its project manager led to increased costs, notwithstanding that the project came in within budget.

We are accordingly satisfied the evidence supports the Tax Court's conclusion, based on Uniszkiewicz's testimony, Ditchey's analysis and its own expertise, that the original costs to construct the reservoir were both sufficiently reasonable and reliable to support trending them forward and that the taxpayer was entitled to a fifteen percent deduction to value for functional obsolescence due to increased costs of construction. See In re Consolidated Edison Co. of N.Y., Inc. v. City of New York, 869 N.E.2d 634, 636 (N.Y. 2007) (noting in a reproduction cost case that "allowing for increased consideration of functional obsolescence may, in the appropriate case, further the purpose of valuation proceedings — to arrive at a fair and realistic appraisal of the value of the property at issue").

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1498-16T3